# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| LADEENA G. ROSE, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case number 1:06cv0081 TCM |
| COOPERATIVE BENEFIT ADMINISTRATORS, INC., | ) ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM AND ORDER

Plaintiff, LaDeena Rose, initiated this action in state court, seeking a judgment that Defendant, Cooperative Benefit Administrators, Inc., improperly terminated her long-term disability benefits and requesting restoration of those benefits. Citing the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, Defendant removed the case to federal court. Now pending before the Court[1] is the opposed motion of Defendant for summary judgment. [Doc. 16]

### Background

Plaintiff began working for Associated Electric Cooperative, Inc. ("AECI"), a rural electric cooperative, in 1981. (Def. Stip. ¶ 4; R. at 464.)[2] Her last job at AECI was as a

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]Both Plaintiff and Defendant filed separate Statements of Uncontroverted Facts without admitting or denying the veracity or accuracy of the opposing party's statements. See E.D. Mo. Local Rule 4.01(E). The Court will refer to both when the fact appears to be uncontroverted.

fourth shift mechanic at the New Madrid power plant.  (Def. Stip. ¶ 27; R. at 464.)  The duties of a mechanic include "setting up and removing scaffolds and rigging, supplying tools and materials, bolting and unbolting turbine castings, stoning joints, dismantling and assembling pumps, repair of boiler castings, repair brick work, cutting pipe, tightening valve bonnets, insulating, and painting, issuing tools, and cleaning machine parts."  (R. at 464.)  Under appropriate supervision or direction, the mechanic "repairs machinery, welds and machine parts[.]"  (Id.)  A mechanic is also required to frequently lift weights from 25 to 30 pounds and to occasionally lift weights from 30 to 50 pounds.  (Id. at 412.)

When working as a mechanic, in May 1999, Plaintiff injured her back.  (R. at 462.)  On November 14, 2001, she underwent a lumbar fusion at the L4-5 level.  (Pl. Stip. ¶ 1; R. at 344.)  The month after this surgery, performed by Dr. Kee B. Park, Plaintiff applied for long-term disability benefits from AECI.  (R. at 461-63.)  She explained in her application that Dr. Park had restricted her from bending over or lifting more than ten pounds.  (R. at 461.)

Pursuant to Plaintiff's application, on January 15, 2002, Dr. Park completed an Attending Physician's Statement of Disability ("APSD").  (R. at 465-66.)  Under the section titled "Prognosis," he answered "no" to the question whether Plaintiff was totally disabled and "no" to "any other work."  (Id. at 466.)  Asked whether vocational counseling or retraining was recommended, he responded, "No."  (Id.)  Asked whether Plaintiff's present job could "be modified to allow for handling with impairment," he responded, "Yes."  (Id.)  He further reported that her trial employment could begin five days before he completed the form, and that it and "any other work" could be full-time.  (Id.)  In response to categories of

physical impairment as defined by the United States Department of Labor's Dictionary of Occupational Titles ("DOT"), Dr. Park checked the Class 4 category, describing Plaintiff's condition as "moderate limitation of functional capacity: capable of clerical/administrative (sedentary) activity." (Id.) He wrote that he recommended "sedentary sit down office work only." (Id.)

Plaintiff's application was approved on January 24. (Id. at 458-59.) The approval letter informed her that during the first 24 months she was eligible to receive long-term disability benefits "as long as [she] remained totally disabled from performing any and every duty of [her] occupation with [her] employer." (Id. at 458.) The definition of disability changed after that 24-month period. (Id.) Plaintiff "must then be totally disabled from performing any and every occupation for which you are reasonably fitted by education, training, and experience." (Id.) On a form completed at Defendant's request and asking about her education, training, and experience, Plaintiff reported that she had a high school degree, had worked in inventory supply in the Army, and had worked since 1981 for AECI. (Id. at 454-55.) Asked if she would like to discuss the possibility of vocational rehabilitation benefits under her coverage, Plaintiff replied, "No." (Id. at 454.) She expected to return to her previous occupation and to "any occupation." (Id.)

On May 20, Dr. Park released Plaintiff to return to work, reporting as follows:

> Ms. Ladeena [sic] Rose is six months status post lumbar fusion at L4-5. She has no back or leg pain. She does have occasional weakness in the left lower extremity. She has been through physical therapy, has gotten her lifting up to 40 pounds without any difficulty. The surgical wounds are well healed. X-rays of the lumbar spine show no instrumentation failure and good fusion at L4-5. At this time, she will be released to go back to work with the only restriction of no overtime. She will let us know how she is doing in four

weeks. If there are no problems, then that restriction will also be removed. She will followup with us on an as needed basis.

(Id. at 179.)

Plaintiff went back to work the next day. (Id. at 214.)

Plaintiff returned to Dr. Park on June 10, complaining of cramping in her left leg. (Id. at 178.) He prescribed Elavil and released her to return to work without restriction. (Id.) On September 5, she complained to Dr. Park of pain in her left thigh running down her left leg to the knee and of some weakness in her left leg after walking for "a couple of hours." (Id. at 177.) He released her to "continue working in [an] unlimited capacity . . . restricted only to her discomfort." (Id.) One week later, she had a follow-up magnetic resonance imaging scan ("MRI") and reported to Dr. Park that she was able to work but with significant pain. (Id. at 176.) He increased her dosage of Neurotin and asked to her report back in four weeks. (Id.) On October 14, Dr. Park reported that Plaintiff was at "maximum medical improvement." (Id. at 174.) He released her to return to work with a permanent 40-pound lifting restriction. (Id.) He also opined that she had a 10% impairment of the whole person, and he released her from his care. (Id.)

The same day, Dr. Park completed another APSD for Plaintiff. (Id. at 430-31.) He rated her as being able to perform work in the DOT Class 2 category – "Medium Manual Activity." (Id. at 431.) Under the prognosis section, he checked the "Yes" box[3] in response to the question, "Is patient totally disabled?" (Id.)

The next day, Plaintiff stopped working. (Id. at 214.)

---

[3]The "No" box appears to be checked and then scratched out.

- 4 -

Shortly thereafter, Plaintiff underwent a functional capacity evaluation ("FCE") arranged at the request of Defendant. (Id. at 424-27.) The FCE was performed on November 12 by Shanan Dorton, a physical therapist. (Id. at 402-07.) The conclusion was that Plaintiff could not perform the critical job demands of a machinist as she described the job, work which would be classified in the DOT as "Heavy." (Id. at 402, 404.) She could, however, perform "Medium Work," defined in the DOT as "[e]xerting 20 lbs. to 50 lbs. of force occasionally, and/or 10 lbs. to 25 lbs. of force frequently, and/or greater than negligible up to 10 lbs. of force continually to move objects." (Id. at 402.) She had no plans to return to work until told to by Social Security. (Id. at 404.)

Subsequently, Defendant arranged for a representative of Intracorp to go to the New Madrid plant to evaluate the tasks required of a shift four mechanic. (Id. at 388, 394-97.) The representative concluded that the job could not be modified to meet Plaintiff's restrictions as outlined in the FCE. (Id. at 394-96.) The representative further concluded that there were two jobs at the plant that Plaintiff could perform within the parameters of the FCE – general utility operator in the bunker room and a position in the operations center. (Id. at 388, 397.) The first job consisted of "filling the coal bunkers, lubricating conveyors, and maintaining the housekeeping in the [bunker] room." (Id. at 384.) A few weeks after Intracorp's evaluation, Plaintiff was advised that her disability benefits were reinstated as of October 15, 2002. (Id. at 398.)

Plaintiff next saw Dr. Park on January 2, 2003, two days after the letter reinstating her benefits was written. (Id. at 173.) She complained of persistent pain down her left leg. (Id.) Dr. Park noted that there was no evidence of nerve root compression. (Id.) Plaintiff

reported some improvement on the Neurotin, but needed additional relief. (Id.) He suggested a left-sided L5 selective nerve root block with steroid injection. (Id.) This procedure was performed on January 14. (Id. at 172.)

Ten days later, AECI instructed Plaintiff to report to work on February 3 as a general utility operator in the bunker room, "with limitations consistent with [her] restrictions." (Id. at 359.) As noted above, this job involved the operation of machinery. (Id. at 384.) Plaintiff's counsel wrote AECI's plant manager, listing the three medications she was then taking – Neurotin, Lorcet, and Flexeril – which warned against operating dangerous machinery and advising him that Plaintiff had just undergone a nerve block with steroid injection. (Id. at 363.) He asked the manager to reconsider the decision to have Plaintiff report to work based on the safety hazard to Plaintiff and other workers created by having Plaintiff operate or be around dangerous machinery. (Id. at 364.) Dr. William E. Morehead also listed Plaintiff's medications in a letter addressed "To Whom It May Concern." (Id. at 167.) He opined that she was unable to perform the requirements of the job offered by AECI and was disabled as of August 29, 2002. (Id.)

On April 2, Plaintiff consulted a nurse practitioner about right knee pain. (Id. at 291.) She had been symptomatic for at least one year. (Id. at 292.) An MRI was performed the same day and a total right knee arthroplasty, or replacement, was performed by August R. Ritter, M.D., on May 13. (Id. at 289, 292.)

On November 12, Plaintiff was interviewed by an Intracorp representative to "assess her medical condition, particularly with reference to the right knee surgery and recovery." (Id. at 270-74.) She was no longer being followed by Dr. Ritter, but was under the care of

her family physician, Dr. Gustavo Grenada. (Id. at 271.) Dr. Ritter had told her in June that she did not require additional therapy. (Id. at 272.) Her knee was still stiff and painful, however, so she was receiving therapy and doing a home exercise program. (Id.) The interviewer noted that Plaintiff "stated she cannot even contemplate working in any job because she does not have consecutive 'good days' because of her arthritis, neuritis, and back pain. . . . She states that there is nothing in which she feels she could be retrained, and is not motivated to attempt to return to any type of work." (Id.)

In March 2004, Plaintiff was advised by Defendant that its representative would be scheduling an independent medical exam ("IME") and FCE for her. (Id. at 268.) The IME was performed the next month by Carl W. Huff, M.D. (Id. at 240-48.) After reviewing Plaintiff's medical records from Drs. Park and Ritter and her 2002 FCE, taking her history, examining her, and taking x-rays of her spine, knees, feet, and pelvis, Dr. Huff concluded as follows:

> [Plaintiff] is able to resume work with a lifting limit of 25 pounds. This is consistent with Dr. Park's recommendation of returning to work with a lifting limit of 40 pounds. She should be able to stand and walk 4 hours out of an 8-hour period. No further treatment is considered necessary. Her condition is considered to be chronic and stable. The lifting restriction of 25 pounds is a permanent restriction and it takes into consideration her back surgery as well as her total knee surgery. Therefore, [Plaintiff] can return to full time gainful employment within these parameters specified.

(Id. at 248.)

The FCE was to be performed on May 4 at a HealthSouth Rehabilitation Center. (Id. at 222.) Plaintiff refused to participate in the FCE, explaining that her "back case" had been settled with AECI and any questions should be directed to her attorney. (Id.)

On June 18, Plaintiff was informed that her 24-month occupational period would end July 3, 2004. (Id. at 218.) Her long-term disability benefits would end as of that date because "[t]he objective medical documentation" indicated that she could perform sedentary occupations. (Id.) Plaintiff was informed of her rights to appeal to Defendant's Appeal Administrator. (Id.)

Defendant is a wholly-owned subsidiary of the National Rural Electric Cooperative Association ("NRECA"), the national trade association for rural electric cooperatives throughout the United States. (Nelson Aff. ¶ 3.) NRECA sponsors disability, life, accident, medical, and other welfare benefit plans, which are made available to its members through a Group Benefits Program. (Id.) The Group Benefits Program "is funded by contributions from participating cooperatives and participants."[4] (Id. ¶ 7.) AECI is a member of the NRECA and has adopted its Group Benefits Program. (Id. ¶ 3.) Included in this Program is NRECA's self-insured, long-term disability plan ("the LTD Plan"), an "employee welfare plan" as defined in § 3(1) of ERISA, 29 U.S.C. § 1002(1). (Id. ¶¶ 4-5.) The LTD Plan "provides long-term disability benefits to employees of [its member rural elective cooperatives, including AECI] through a trust fund called the NRECA Group Benefits Trust ('Trust')." (Id. ¶ 5.) Benefits due under the LTD Plan are paid out of the Trust. (Id. ¶ 7.) "NRECA, [Defendant], and the cooperatives do not retain any control or ownership over funds paid to the Trust." (Id.) "The Trust is a tax-exempt Voluntary Employees' Benefit Association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986." (Id. ¶ 5.)

---

[4]Title 26 C.F.R. § 1.501(c)(9)-1(d) requires that no part of the net earnings of the Trust inures to the benefit of any private shareholder or individual.

Defendant is the claims adjudicator for the LTD Plan. (Id. ¶ 6.) Paragraph 9.07 of the Group Benefits Program outlines the discretion granted Defendant:

> <u>Grant of Discretion</u>. In discharging the duties assigned to them under the Program, the Committee, the Plan Administrator and [Defendant] and their delegates have the discretion and final authority to interpret and construe the terms of the Plans; to determine coverage and eligibility for benefits under the Plans; to adopt, amend, and rescind rules, regulations and procedures pertaining to their duties under the Plans, and the administration of the Plans; and to make all other determinations deemed necessary or advisable for the discharge of their duties or the administration of the Program. The discretionary authority of the Committee, the Plan Administrator and [Defendant] and their delegates is final, absolute, conclusive and exclusive, and binds all parties so long as exercised in good faith. NRECA, as sponsor of the Program, specifically intends that judicial review of any decision of the Committee, the Plan Administrator or [Defendant], or an insurance company that is a claims adjudicator under subsection 8.02, and their delegates be limited to the arbitrary and capricious standard of review. The express grant of any specific power to a party with respect to any duty assigned to it under the Program should not be construed as limiting any power or authority of that party to discharge its duties.

(R. at 14-15.)[5] Clearly, with respect to claims for benefits under the LTD Plan, Defendant is a fiduciary as defined in Section 402(a) of ERISA, 29 U.S.C. § 1102(a).

The terms and conditions of the LTD Plan that Defendant had to interpret and construe included the following definitions:

> "Totally Disabled" means that the Participant is both:
> (i) due to sickness or accidental bodily injury
> (A) completely unable to perform any and every duty pertaining to the Participant's occupation with the Participating Cooperative, and
> (B) after two years measured from the end of the Benefit Waiting Period, completely unable to engage in any and every gainful

---

[5]NRECA Group Benefits Program and its amendments are included in the Administrative Record at pages 1-133.

occupation for which the Participant is reasonably fitted by education, training or experience, and

(ii) not engaged in any Gainful Occupation and is not confined in a penal institution or other house of correction as a result of conviction for a criminal or other public offense.

(R. at 21.)

Additionally, the LTD Plan provided:

<u>Examinations and Verifications</u>. (a) [Defendant] may periodically require any Participant who has applied for or who is receiving Total Disability benefits to furnish such information as [Defendant], in its sole discretion, deems necessary to establish the Participant's initial or continuing eligibility for payment of Total Disability benefits, including (but not by way of limitation) financial and medical records. [Defendant] may also require that the Participant be examined by a physician of [Defendant's] choice at such times and at such frequency as [Defendant], in its sole discretion, deems necessary to establish the Participant's initial or continuing eligibility for payment of Total Disability benefits.

(<u>Id.</u> at 27.) The LTD Plan also provides for sole discretion to lie with Defendant about whether a program of vocational rehabilitation is within the ability of a totally disabled participant. (<u>Id.</u> at 31.) Vocational rehabilitation was not offered to Plaintiff.

If, as in Plaintiff's case, long-term disability benefits are terminated, the Group Benefits Program outlines an appeal procedure. (<u>Id.</u> at 11.) As Plaintiff was advised, the first step is to file an appeal in writing with Defendant. (<u>Id.</u> at 12.) Within 60 days of receipt of an appeal, Defendant is to render a written decision or give the claimant written notice that the time has been extended. (<u>Id.</u>) The decision then must be rendered within 120 days. (<u>Id.</u>) If this decision is adverse, judicial review must be sought within one year. (<u>Id.</u>)

Plaintiff filed her first-step appeal with Defendant's Appeal Administrator, enclosing all her medical records, discussed above, and a Social Security disability determination,

discussed below. (Id. at 154-202.)  Her appeal was referred to Defendant's consultant, ProPeer Resources, Inc., for further medical review. (Id. at 147.)  In December 2004, Randy Jensen, M.D., reviewed her records, particularly noting Dr. Park's October 14, 2002, report, Dr. Morehead's letter, and Dr. Huff's IME report. (Id. at 150-51.)  Dr. Jensen concluded that Plaintiff did not meet the LTD Plan criteria for total disability because she was able to perform work under the parameters defined by the reporting doctors. (Id. at 151.)  Citing Dr. Jensen's review and Dr. Huff's report, Defendant denied Plaintiff's appeal. (Id. at 147-48.)  The letter informing Plaintiff of the denial also advised her that she could file an additional appeal with Defendant's Appeal Committee and, if she choose to do so, that she should submit any relevant documents or records to support her claim. (Id. at 147.)  Plaintiff did file an appeal. (Id. at 139.)  Her attorney also informed the Committee that, after he reviewed medical information, he planned to provide them with a statement of argument on Plaintiff's behalf. (Id.)  On April 11, the Committee informed counsel that he had 45 days from the date of his letter to send any additional information.[6] (Id. at 138.)  On July 19, counsel was informed that Plaintiff's appeal would be reviewed at the Committee's next meeting. (Id. at 137.)  As of July 20, no further information was received from counsel. (Id. at 136.)  By letter of August 3, counsel was informed of the decision of the Appeals Committee denying her benefits claim. (Id. at 133-34.)

Shortly after Plaintiff's application for long-term disability benefits was approved for the first 24 months, see page 3, supra, Plaintiff applied for Social Security disability benefits.

---

[6]The Court notes that 45 days from counsel's letter of February 24, 2005, would have been April 10 – the day before the Committee's letter.

(Id. at 456-57.) Her application was denied initially, but was then granted by an Administrative Law Judge ("ALJ") after a review of the written record. (Id. at 432-443, 449-52.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity after October 1, 2001. (Id. at 442.) She had severe impairments of "degenerative disc disease requiring surgery with continuing pain and S1 radiculopathy and chronic breast infection." (Id.) The ALJ found that Plaintiff lacked the residual functional capacity to return to her past relevant work as a power plant control room operator or power plant mechanic and that she had no transferable skills except for the same or similar work. (Id. at 441, 442.) Moreover, her capacity for the full range of sedentary work was reduced by "additional limitations that narrow the range of work she [could] perform." (Id. at 442.) Specifically, she could "do limited standing and walking, lifting and carrying of 5 pounds or less, and no repetitive bending or stooping. She has continuing pain that interferes with sustained work at any level of exertion." (Id.) She was disabled as of October 1, 2001. (Id.) Benefits were awarded accordingly. (Id. at 432.)

Arguing that its decision to deny Plaintiff long-term disability benefits should be reviewed under the arbitrary and capricious standard, Defendant moves for summary judgment. That decision satisfies this standard because (a) Plaintiff was not totally disabled under the "any occupation" standard in the LTD Plan definitions; (b) the record established that she was capable of performing up to medium work; (c) she has not produced any credible evidence that she is totally disabled from "any occupation"; (d) Defendant need not defer to the Social Security disability decision; and (e) the Court should defer to Defendant's

decision. Plaintiff counters that Defendant's decision is not supported by substantial evidence and Defendant should defer to the Social Security disability decision.

## Discussion

"'Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.'" **Rittenhouse v. UnitedHealth Group Long Term Disability Ins. Plan**, 476 F.3d 626, 631 (8th Cir. 2007) (quoting Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir. 2000)). In the instant case, the issue is whether Plaintiff is disabled as defined by the LTD Plan under the undisputed facts.

"ERISA . . . is a comprehensive statute that sets certain uniform standards and requirements for employee benefit plans," **Minnesota Chapter of Associated Builders and Contractors, Inc. v. Minnesota Dep't of Public Safety**, 267 F.3d 807, 810 (8th Cir. 2001) (interim quotations omitted) (alteration added), and was enacted to prevent "the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds," **Massachusetts v. Morash**, 490 U.S. 107, 115 (1989).

In ERISA cases, the Court conducts a de novo review of the denial of benefits "*unless* a plan administrator has discretionary power to construe uncertain terms or to make eligibility determinations, when review is for abuse of discretion." **Rittenhouse**, 476 F.3d at 628. The policy or other plan documents must include explicit language granting this discretionary power to trigger a deferential standard of review. **McKeehan v. Cigna Life**

**Ins. Co.**, 344 F.3d 789, 793 (8th Cir. 2003). Accord **McGarrah v. Hartford Life Ins. Co.**, 234 F.3d 1026, 1030 (8th Cir. 2000) ("In general, the abuse-of-discretion standard applies if, as in this case, the plan expressly gives the administrator discretion to determine eligibility for benefits and to construe the terms of the plan."). Under the abuse-of-discretion standard, the plan administrator's decision is reversed "'only if it is arbitrary and capricious.'" **Groves v. Metro. Life Ins. Co.**, 438 F.3d 872, 874 (8th Cir. 2006) (quoting Hebert v. SBC Pension Benefit Plan, 354 F.3d 796, 799 (8th Cir. 2004)).

Paragraph 9.07 of the Group Benefits Program is titled "Grant of Discretion." Its language explicitly grants Defendant the authority to, inter alia, "interpret and construe the terms of the Plans" and "to determine coverage and eligibility for benefits under the Plans." (R. at 14.) The Court finds that this discretionary power granted to Defendant is sufficient to trigger the abuse-of-discretion standard of review.

Under this standard, Defendant's decision denying Plaintiff long-term disability benefits must be affirmed "if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable *would* have reached that decision." **Rutledge v. Liberty Life Assur. Co. of Boston**, 481 F.3d 655, 659 (8th Cir. 2007) (quoting Groves, 438 F.3d at 875). "The essence of the inquiry is whether the decision is supported by substantial evidence." **Id.** "Substantial evidence is 'more than a scintilla, but less than a preponderance.'" **Id.** (quoting Ferrari v. Teachers Ins. & Annuity Ass'n, 278 F.3d 801, 807 (8th Cir. 2002)). In determining whether there is substantial evidence, "'both the quantity and the quality of evidence'" are considered. **Id.** (quoting Groves, 438 F.3d at 875).

Plaintiff argues that Defendant's determination that Plaintiff is not totally disabled under the "any occupation" standard is not supported by substantial evidence. Under the terms of the LTD Plan, the definition of "totally disabled" changes "after two years measured from the end of the Benefits Waiting Period. (R. at 21.) This definition requires that, in order to be eligible for long-term disability benefits, a participant be "completely unable to engage in any and every gainful occupation for which the Participant is reasonably fitted by education, training or experience . . ." (Id.)

The file before Defendant included the records of Drs. Park and Ritter, the FCE, Dr. Huff's IME of Plaintiff, and the report of Dr. Jensen, a non-examining consultant. The file also included her report on her education, training, and experience. Dr. Park's records included one in May 2002 releasing Plaintiff to return to work after her November 2001 back surgery and restricting her from overtime. This record also noted that Plaintiff was lifting up to 40 pounds without difficulty in physical therapy. His records reported Plaintiff's regular complaints of leg pain. On October 14, 2002, he concluded that she had reached maximum medical improvement, assessed her as having a 10% impairment of the body as a whole, released her to return to work with a 40-pound weight lifting restriction, and released her from his care. The same day, he completed an APSD form and assessed Plaintiff as being capable of performing medium manual activity; however, he checked the "totally disabled" box on the form. He treated Plaintiff again in January 2003 for left leg pain.

Dr. Park's opinion that Plaintiff could perform medium manual activity was echoed in the results of a FCE of Plaintiff conducted by a physical therapist in November 2002. A

few months later, Dr. Morehead opined that Plaintiff could not perform the requirements of her present job. He placed her disability onset date in August 2002. There were no other records of Dr. Morehead before Defendant; he was not named by Plaintiff as her family physician. Plaintiff had right knee surgery in May 2003. She was told the next month by Dr. Ritter that she did not need additional therapy. Ten months later, in April 2004, after conducting an IME, Dr. Huff reported that Plaintiff could return to gainful employment with some weightlifting restrictions. Dr. Jensen concurred.

Only in Dr. Park's APSD form is Plaintiff classified as totally disabled. This conclusion is internally inconsistent with his contemporaneous opinion that she could return to work with a weight-lifting restriction. See **Groves**, 438 F.3d at 875. Moreover, it was inconsistent with the later conclusions of Dr. Huff, who had conducted an IME closer in time to the relevant period, that Plaintiff was able to return to work with a lifting restriction. "'Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled.'" **Rutledge**, 481 F.3d at 660 (quoting Delta Family-Care Disability and Survivorship Plan v. Marshall, 258 F.3d 834, 843 (8th Cir. 2001)). Even if those conflicting medical opinions include one by a reviewing physician, the plan administrator may rely on that physician's contrary opinion, see **Groves**, 438 F.3d at 875, and need not defer to her treating physician, see **Hillery v. Met. Life Ins. Co.**, 453 F.3d 1087, 1091 (8th Cir. 2006).

Defendant also did not abuse its discretion in not deferring to Dr. Morehead's opinion. There is no evidence of his relationship to Plaintiff and whether he treated or examined her. See **Groves**, 438 F.3d at 875 (finding that plan administrator did not act unreasonably in

rejecting physician's favorable opinion; opinion was not supported by any reliable objective evidence "or other convincing medical proof"). Morever, he does not classify Plaintiff as totally disabled; he simply concluded that she was unable to perform her job as a machinist – a question not in dispute.

According to the LTD Plan, Plaintiff's benefits could be terminated if she failed to "furnish written proof" of her continued eligibility, "satisfactory to [Defendant], when and as required by [Defendant]." (R. at 25.) Although required under the terms of the Plan to submit to a FCE if requested, Plaintiff refused to do so. Although she indicated she would submit an additional argument, she failed to do so. See **Ferrari**, 278 F.3d at 806 (finding no abuse of discretion in plan administrator's termination of benefits based, in part, on claimant's failure to authorize administrator's access to his records).

The record before Defendant included "more than a scintilla" of evidence that Plaintiff could perform a gainful occupation. Based on this evidence, Defendant did not abuse its discretion in denying her continued long-term disability benefits.

Plaintiff further argues, however, that Defendant abused its discretion in not deferring to the favorable opinion of the Social Security Administration ("SSA") that she is disabled, and was so as of October 2001.

"[A]n 'ERISA plan administrator or fiduciary generally is not bound by a[n] SSA determination that a plan participant is "disabled,"' even when the plan's definition of disabled is similar to the definition the SSA applied." **Farvalla v. Mutual of Omaha Ins. Co.**, 324 F.3d 971, 975 (8th Cir. 2003) (quoting Jackson v. Metro. Life Ins. Co., 303 F.3d 884, 889 (8th Cir. 2002)) (first alteration added). Accord **Rutledge**, 481 F.3d at 660-61. An

SSA "decision has no *res judicata* or other controlling effect" in an ERISA disability benefits determination. **Coker v. Metro. Life Ins. Co.**, 281 F.3d 793, 798 (8th Cir. 2002). As in **Coker**, the ALJ in Plaintiff's case based his favorable decision, in part, on Plaintiff's "own subjective allegations." (R. at 441.) "The determination that [Plaintiff] suffers from a pain-based disability under Social Security regulations does not require [Defendant] to reach the same conclusion." **Id.** (alterations added) (noting that the Eighth Circuit Court of Appeals has specifically declined to extend its holding in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), governing the evaluation of a Social Security claimant's subjective complaints, to ERISA cases).

Thus, Defendant did not abuse its discretion in not deferring to the SSA decision.

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the motion of Cooperative Benefit Administrators, Inc., for summary judgment is **GRANTED**. [Doc. 16

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of May, 2007.